UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 21-CR-60019-GRAHAM

UNITED STATES OF AMERICA,

Plaintiff,

JOHN FRITZBERT WATSON, JR.,

Defendant.

---

**DEFENDANT'S MOTION TO DISMISS INDICTMENT FOR VIOLATION OF THE SIXTH AMENDMENT**

COMES NOW, the accused, JOHN FRITZBERT WATSON, JR., (herein referenced as BERT WATSON, JR.), by and through undersigned counsel, CHRISTOPHER A. GRILLO, and pursuant to the SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION, relevant UNITED STATES SUPREME COURT cases, including but not limited to *U.S. v. Marion*, 404 U.S. 307, (1971); *Barker v. Wingo*, 407 U.S. 517, (1972); *Doggett v. U.S.*, 505 U.S. 647 (1992), and significant case law from lower courts; and pursuant to Federal Rule of Criminal Procedure 48(b), respectfully moves this Court to dismiss the Indictment, and as grounds therefore, would state:

I. INTRODUCTION

This Motion asks whether the Constitution permits the Government to let four and a half years go by, (April 2016 to January 19, 2021) before they determine to indict a defendant, know his whereabouts, communicate directly with him over a period of years, procure his arrest

through foreign authorities, and nevertheless delay bringing him before the Court for approximately five years.

Under the Sixth Amendment, the answer is no.

Although the Government has consistently characterized the accused, BERT WATSON, JR., as a fugitive who remained outside the United States after Indictment, the Government's own filings establish a markedly different chronology.

Indeed, the Government's familiarity with the Accused substantially predated the investigation resulting in this Indictment. BERT WATSON, JR. had previously voluntarily testified as a Government witness in a Sunset-related federal prosecution involving members of the same prosecution office in February 2014.

Long before returning the Indictment, federal investigators had identified the Accused, knew precisely where he resided and possessed his telephone number and email address. Mr. Watson provided his full name, date of birth, Social Security number and his address in the United States. An FBI Agent communicated with Mr. Watson via e-mail, and, in fact, Mr. Watson called the Agent on July 1, 2020. During that interview, the Accused disclosed his residence, answered investigators' questions, and communicated directly with the Federal Bureau of Investigation. Nevertheless, the Accused was not brought before this Court until January 2026, more than five years after the Indictment was returned. During that period, the Government knew Mr. Watson's whereabouts, maintained direct communications with him, and possessed repeated opportunities to secure his appearance. Yet approximately five years elapsed before the Accused was brought before this Court.

The Government's own filings further establish that in September 2021, Nicaraguan authorities arrested the Accused as requested by the United States. Rather than demonstrating an inability to locate the Accused, those events establish that the Government knew exactly where

the Accused was located and successfully caused his arrest through international law-enforcement channels. The Government further acknowledges that Mr. Watson was subsequently released.

This prosecution arose from conduct allegedly occurring between October 2014 and 2015, and one alleged act occurred in 2016, an email that is arguably not a part of the charged conspiracy in the Indictment. By the time the Accused first appeared in January 2026, nearly a decade had elapsed since the events charged.

Because the Government knew the Accused 's whereabouts, maintained direct communication with him, and successfully procured his arrest through foreign authorities, the resulting five-year post-indictment delay cannot simply be attributed to an unavailable defendant. Rather, it must be examined under the balancing framework established in *Barker v. Wingo*, 407 U.S. 514 (1972), and *Doggett v. United States*, 505 U.S. 647 (1992), and applied by the Eleventh Circuit in *United States v. Register*, 182 F.3d 820 (11th Cir. 1999), and *United States v. Ingram*, 446 F.3d 1332 (11th Cir. 2006).

The resulting prejudice is substantial. During the extraordinary period of delay occasioned by the lack of activity or the incompetent activity by the Government, memories have faded, records have been more difficult or impossible to obtain and witnesses have died.

Daniel Vaughn was an attorney licensed in the State of Washington who was legal counsel to Sunset Capital and its later iterations for several years before, during and after the time frame alleged in the Indictment. Mr. Vaughn is now retired and has suffered a significant medical event, a stroke.

During the time that he was the attorney for Sunset, he prepared or participated in the preparation of legal documents to include contracts, Confidential Private Placement Memoranda, Annual Reports and financial documents filed with governmental agencies. A selection of these

documents have been identified as Exhibits in the earlier trial on this Indictment in *U.S. v. Horn*, *et al*, 21 CR-60019 before the Honorable Rodney Smith in 2022.

According to documents provided in discovery, Mr. Vaughn issued letters, other communications and documents, attesting to the value of the gems in question as well as the lawful nature in which Sunset operated.

It is anticipated that the Government will seek the introduction of these documents in the trial scheduled before Judge Graham. Mr. Vaughn will be listed as the Attorney in the Defendant's Notice of Reliance on the Advice of Counsel.

John Bert Watson, Sr., passed in September 2021. Mr. Watson, Sr., was a well-known figure in Banking and Finance in the Jacksonville, Florida area prior to taking over Sunset. Bert Watson, Sr. was the Chairman of the Board of Sunset. He was the father of the Accused. His death permanently deprived his son of material insight to and/or testimony to the charged events. While Chairman of the Board, Bert Watson, Sr. conducted regular meetings wherein he and the other Officers and Directors of Sunset would discuss business strategies and would directly be in contact with Dan Vaughn, the Attorney for the company, and potential investors and business owners. Mr. Watson, Sr., also communicated directly and indirectly with Govind Prasad, the head of the corporation that owned and possessed the gems and historical artifacts at issue in the Indictment. Bert Watson, Sr., the father, was the "boss." He knew everything. His knowledge of the workings of Sunset is irreplaceable.

In addition to the prejudice created by the Government's delay in prosecuting as discussed above, Mr. Govind Prasad also passed away. Even though he was listed on the Government's Witness List for the *U.S. v Horn*, 21 CR-60019, he was never called as a witness. Mr. Prasad, a native of India, was the principal of a non-profit corporation that owned gemstones, rubies and

statues. Mr. Prasad had knowledge about the history of the gems, their provenance, their value based on appraisals he had done on the gems and what he believed the gems were worth; over a billion dollars. Mr. Prasad had knowledge of transactions between his non-profit and HAF Capital, a company managed by Bert Watson, Sr. Mr. Prasad would have been able to testify that, *inter alia,* the gems would be pledged as assets for Sunset as a way to monetize other projects and to raise capital.

Mr. Prasad would have been available to testify about his relationship between Bert Watson, Sr., and the Accused, Bert Watson, Jr., and the fact that Bert Watson, Sr. ran Sunset.

Walter Williams has also passed away. He was a Member of the Board of Directors of Sunset. He had an expertise in Real Estate and REITS and would have been available to explain the Real Estate component of Sunset as well as provide insight into investments by Sunset and others in terms of financial services. He attended regular meetings in Bert Watson, Sr.'s office.

The prejudice to the Defense created by the Government's delay in bringing Mr. Watson to Court is overwhelming.

Under the Sixth Amendment to the United States Constitution, the Indictment should be dismissed with prejudice.

## <u>11. FACTUAL BACKGROUND</u>

### A. Alleged Conduct

On January 19, 2021, a federal grand jury sitting in the Southern District of Florida returned seven-count Indictment charging the Accused John Fritzbert Watson, Jr., together with three co-defendants, with conspiracy and securities fraud offenses arising from the offering of securities issued by Sunset Capital Assets, Inc. The Indictment alleges conduct occurring principally between October 2014 and 2015, and one alleged act in 2016. The Government

alleges that the Accused served as a director and Chief Investment Officer of Sunset Capital Assets and participated in alleged misrepresentations concerning the company's assets, business operations, and use of investor funds.

Thus, by the time the Accused first appeared before this Court in January 2026, nearly ten years had elapsed since the last alleged criminal conduct charged in the Indictment.

### B. The Indictment Charges Two Conspiracies and Five Transaction-Specific Securities Fraud Counts

The seven counts arise from a single alleged Sunset Capital Assets stock offering and substantially overlap in their factual theory.

Count 1 charges Watson and the three co-defendants with conspiracy to commit mail fraud and wire fraud, in violation of 18 U.S.C. 1349, from approximately October 2014 through April 2016. The alleged objects were a scheme to obtain money and property through materially false representations and the use of the mails and interstate wires. The Indictment alleged misrepresentations and omissions concerning the use of investor funds, Sunset's assets and lines of business, the identity and disciplinary history of Omar Plummer, and the alleged diversion of offering proceeds.

Count 2 charges the same four defendants, over the same October 2014-April 2016 period, with conspiracy under 1 8 U.S.C. 371 to violate the federal securities-fraud provisions in 15 U.S.C. §§77q(a) and 77x. Count 2 expressly incorporates the manner and means alleged in Count 1 and alleges overt acts involving investor solicitations, emails, payments of commissions, and stock issuances. Two overt acts specifically attributed to BERT WATSON, JR. are an alleged January 16, 2015, email to investor D.C. transmitting Sunset's Private Placement Memorandum and a subscription agreement signed by Bert Watson, Sr., and an alleged April 6, 2016, e-mail directing Sunset's transfer agent to issue shares to offering investors.

Counts 3 through 7 charge substantive securities fraud under 15 U.S.C. 77q(a) and 77x and aiding and abetting under 18 U.S.C. 2. Those counts re-allege the general allegations, the Count 1 manner and means, and the Count 2 overt acts, and then identify five particular stock transactions: Count 3 concerns approximately 5,000 Sunset shares sold to investor S.J. for $5,250 between November 20, 2014 and January 29, 2015; Count 4 concerns approximately 105,000 shares sold to investor D.C. for approximately $10,500 between January 14 and January 29, 2015; Counts 5 and 6 concern two separate sales to investor S.W. at approximately 9,524 shares for $10,000 between December 16, 2014 and January 30, 2015, and approximately 11,111 shares for $10,420 between December 16, 2014 and February 20, 2015; and Count 7 concerns approximately 20,000 shares sold to investor E.P. for $25,000 between April 9 and May 14, 2015.

The Indictment's theory therefore makes the availability of insightful witnesses particularly important. It attributes to BERT WATSON, JR. and Bert Watson, Sr.'s joint roles in preparing offering materials, recruiting brokers and sales agents, making or causing representations to investors, controlling or using Sunset Capital Assets, Inc., Investment Capital Fund Group LLC, and Jabez Capital Holdings LLC accounts, and transferring offering proceeds. John Bert Watson, Sr., is not a peripheral witness to that theory: he is charged as a co-conspirator in Counts 1 and 2, as a principal or aider and abettor in Counts 3 through 7, and is specifically identified in the Count 2 overt acts as the signatory on D.C.'s subscription agreement. His death during the post-indictment delay therefore bears directly on BERT WATSON, JR.'s ability to defend the charged agreements, intent, allocation of responsibility, source of alleged representations, and the transaction specific securities fraud counts.

### C. The Accused Previously Testified for the Government in a Sunset-Related Prosecution

Before the present prosecution, The Accused voluntarily testified as a Government witness at the trial of *United States v. Altomare*, Case No. 0:13-cr-60240-WPD-1, a federal prosecution involving Sunset-related matters. Members of the prosecution team in that case are also members of the prosecution office in the present case.

The Accused's prior testimony is relevant to the history preceding this prosecution. Federal prosecutors were not merely aware of Defendant; members of this prosecution team were familiar with him years before the present Indictment and had previously dealt directly with him as a Government trial witness concerning Sunset-related matters. That history provides additional context for the Accused 's subsequent voluntary communications with federal investigators concerning Sunset while openly residing in Nicaragua.

While the Government argued in the *Altomare* trial that the accused and his company were victims of Altomare's fraud, they now argue that the accused lied at that trial.

### D. Government identified and located the accused before the indictment

Contrary to any suggestion that the Accused 's whereabouts were unknown following the Indictment, the Government's own filings establish that federal investigators had identified the Accused and located him months before charges were returned. Federal investigators had identified the Accused, knew precisely where he resided, and possessed his telephone number and email address. Mr. Watson had provided his full name, date of birth, Social Security number and his address in the United States. An FBI Agent communicated with Mr. Watson via e-mail. On July 1, 2020, FBI Special Agent Alonzo Palomares conducted a telephone interview with the Accused while the Accused openly resided in Nicaragua. During that interview, the Accused

voluntarily disclosed his residence, answered the agent's questions, and discussed matters relating to the Government's investigation. According to the Government, the Accused advised the FBI that he was living on a Coffee Plantation in Nicaragua and made numerous and substantive statements regarding Sunset Capital Assets and related entities. The FBI utilized a pretextual statement to address the Accused and didn't advise Mr. Watson he was a target of the investigation.

Following the interview, Agent Palomares continued communicating with the Accused by email regarding additional discussions. The Accused responded to those communications, and the parties exchanged emails concerning future contact.[1] These communications establish that, well before the return of the Indictment, the Government possessed the Accused's telephone number, email address, approximate physical location, and other identifying information. At that time, the Accused was not concealing his whereabouts or refusing communication with federal investigators. Rather, the Government had established direct contact with the Accused and successfully interviewed him concerning the investigation.

**E. The January 2021 Indictment**

On January 19, 2021, the Grand Jury returned the Indictment. Within days, Agent Palomares transmitted a copy of the Indictment directly to the Accused by email and requested that the Accused contact him to arrange a voluntary surrender. The Government therefore possessed a functioning method of direct communication with the Accused immediately following the return of the Indictment. Although the Government alleges the Accused did not respond, its own filings demonstrate that investigators continued to know the Accused 's location and maintained the ability to communicate with him electronically.

[1] The Accused has requested copies of all emails between him and the FBI.

**F. The Accused was arrested in Nicaragua in September 2021**

The Government's own filings establish that the Accused was not merely known to investigators - he was actually arrested through the Government's international efforts. According to the Government, on or about September 3, 2021, Nicaraguan authorities arrested the Accused as requested by the United States. The Government further acknowledges that Nicaragua proposed transferring the Accused under conditions discussed between the respective governments, but that those efforts were not completed. Instead, the Accused was released and remained in Nicaragua.

These events are significant because they demonstrate that the Government successfully located the Accused caused his arrest through international law enforcement and actively participated in diplomatic discussions concerning his transfer to the United States. The delay that followed therefore cannot be attributed to ignorance of the Accused's whereabouts.

**G. The Government continued to know the Accused's whereabouts following his release**

The Government's own discovery filings demonstrate that the investigation and prosecution involved continuing communications among numerous federal agencies, prosecutors, diplomatic personnel, and foreign governmental officials over an extended period of years.

Those filings describe participation by, among others, the Federal Bureau of Investigation, the United States Attorney’s Office, the Department of Justice, the United States Marshals Service, the United States Department of State, Embassy personnel stationed in Managua, diplomatic security officials, and foreign governmental authorities involved in the Accused's arrest, detention, release, and eventual return to the United States.

The Government's own chronology further reflects continuing governmental awareness of the Accused and his status following the September 2021 arrest and release. The Accused did not simply disappear from the Government's knowledge. The Government was also aware that the COVID Pandemic which began in early 2020, precluded most International travel for several years and that the United States Government imposed strict requirements to travel to the United States.

**H. The Accused initiated communications regarding his return to the United States**

The Accused again demonstrated an intention to return to the United States to face the charges in the Indictment. The Government acknowledges that, on August 30, 2025, the Accused himself contacted Agent Palomares seeking instructions concerning his return to the United States. Agent Palomares responded that the Accused could fly to Miami International Airport. The Accused immediately advised that he lacked a valid passport or other identification necessary to travel internationally. These communications occurred directly between the Accused and the FBI and demonstrate that the Accused was not concealing his location and, by August 2025, was affirmatively seeking instructions concerning his return. Additionally, the Accused contacted the U.S. Embassy in Managua in January 2026 to arrange a meeting with them (to facilitate his surrender) but was arrested by the Nicaraguan authorities before they could meet.

**I. The Accused was not brought before this court until January 2026**

Despite having identified the Accused before indictment, communicating with him directly, interviewing him, causing his arrests in Nicaragua, participating in diplomatic discussions concerning his transfer, and later receiving the Accused's own request for instructions regarding his return, the Accused did not appear before this Court until January

2026, approximately five years after the Indictment and nearly a decade after the charged conduct.

By that time, the Accused's partner and father co-defendant, John Bert Watson, Sr. as well as Mr. Govinda Prasad, had died, permanently eliminating a potentially material source of testimony concerning the charged events. The extraordinary passage of time likewise diminished witness memories and complicated the preservation and retrieval of evidence concerning transactions occurring approximately a decade earlier.

## 111. ARGUMENT

### A. The Government violated the accused 's Sixth Amendment right to a speedy trial.

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the Accused shall enjoy the right to a speedy and public trial." *U.S. Const. Amend. VI.* That constitutional protection attaches upon indictment, regardless of whether the Accused has yet been arrested or made an initial appearance. *United States v. Marion*, 404 U.S. 307, 320 (1971). In *Barker v. Wingo*, 407 U.S. 514 (1972), the Supreme Court rejected any rigid time period for determining whether the Speedy Trial Clause has been violated. Instead, courts balance four interrelated factors: (1) the length of the delay; (2) the reason for the delay; (3) the Accused 's assertion of the right; and (4) prejudice resulting from the delay. No single factor is dispositive; the Court must engage in a sensitive balancing process in light of the circumstances presented. *Id*. at 530-33.

The Supreme Court subsequently emphasized in *Doggett v. United States*, 505 U.S. 647 (1992), that extraordinary post-indictment delay resulting from governmental negligence may violate the Sixth Amendment even without affirmative proof of particularized prejudice. As the Court explained, "time's erosion of exculpatory evidence and testimony can rarely be shown."

*Id*. at 655. The Eleventh Circuit likewise holds that where the first three *Barker* factors weigh heavily against the Government, a defendant need not independently establish actual prejudice. *United States v. Register*, 182 F.3d 820, 827 (11th Cir. 1999); *United States v. Ingram*, 446 F.3d 1332, 1336 (11th Cir. 2006).

The Eleventh Circuit has repeatedly emphasized that the Government bears the burden of explaining the cause of post-indictment delay. *United States v. Ingram*, 446 F.3d 1332, 1337 (11th Cir. 2006); *United States v. Machado*, 886 F.3d 1070, 1080 (11th Cir. 2018). Although governmental negligence weighs less heavily than deliberate delay, its weight increases as the delay becomes more prolonged because "the weight we assign to official negligence compounds over time as the presumption of evidentiary prejudice grows." *Doggett v. United States*, 505 U.S. 647, 657 (1992); *Machado*, 886 F.3d at 1080.

Recent decisions within this Circuit confirm that the *Barker* inquiry remains a circumstance specific balancing process and that extraordinary delay may warrant dismissal with prejudice. In *United States v. Scott*, 2025 WL 590045 (M.D. Fla. Feb. 24, 2025), the court dismissed an indictment with prejudice following a post-indictment delay of nearly five years - the same approximate period presented here. Although the Government argued that the United States Marshals Service was understaffed and lacked sufficient resources, the court held that two attempts to apprehend the Accused during almost five years did not constitute a serious or diligent effort. The court ultimately concluded that the first three *Barker* factors weighed heavily against the Government, presumed prejudice, and dismissed the indictment with prejudice.

Likewise, in *United States v. Odunna*, 818 F. Supp. 3d 1333 (S.D. Fla. 2025), the court dismissed an indictment where the Accused had been residing abroad, and the Government attempted to justify years of inactivity based upon the perceived difficulty of extradition. The court rejected that justification, explaining that while extradition may have been "challenging",

challenging was "far from futile. " *Id.* The constitutional defect was not that the Government failed to immediately secure the defendant's extradition; it was that, for approximately seven years, "the Government did not even try." *Id*. The court characterized that prolonged inactivity as "findable negligence" and contrasted it with the Government's later, constitutionally adequate efforts involving Interpol and regular communications with its Legal Attaché.

The same principle has repeatedly been applied within this District. In *United States v. Bell*, 546 F. Supp. 3d 1136, 1143 (S.D. Fla. 2021), the court dismissed the indictment because the Government failed to fulfill its constitutional obligation to make a diligent, good-faith effort to locate and apprehend the defendant. And in *United States v. Orozco Contreras*, 586 F. Supp. 3d 1272, 1283-85 (S.D. Fla. 2022), the court concluded that merely entering an arrest warrant into NCIC did not establish constitutionally sufficient diligence where the Government otherwise remained inactive despite information permitting it to locate the defendant.

Those authorities reinforce the controlling principle articulated by the Eleventh Circuit: "A defendant has no duty to bring himself to trial; the Government has that duty. " *Ingram*, 446 F.3d at 1337 (quoting *Barker*, 407 U.S. at 527). The Government must make a "diligent, good-faith effort" to locate and bring an indicted defendant to trial. *United States v. Bagga*, 782 F.2d 1541, 1543 (11th Cir. 1986).

Other recent decisions within this Circuit reinforce the same constitutional framework. In *United States v. Holland*, 780 F. Supp. 3d 1287, 1310-23 (N.D. Ga. 2025), the court dismissed a federal prosecution with prejudice after balancing the *Barker* factors and finding substantial prejudice from extraordinary delay. Likewise, in *United States v. De La Torre*, No. 20-20185-CR, 2022 WL 20538953, at 14-18 (S.D. Fla. Oct. 21, 2022), the court recommended dismissal with prejudice where delay, the age of the underlying allegations, and resulting prejudice combined to violate the accused's speedy-trial rights.

**B. Application of these principles demonstrates that Watson's Sixth Amendment right was violated.**

**1. The length of the delay weighs heavily against the Government**.

The first *Barker* factor serves two related purposes. First, it determines whether the delay is sufficiently lengthy to trigger constitutional analysis. Second, once that threshold is met, the magnitude of the delay itself becomes part of the balancing process. *Doggett*, 505 U.S. at 651-52. Here, there can be no dispute that the delay is extraordinary. The Grand Jury returned the Indictment in January 2021. The Accused was not brought before this Court until January 2026, approximately five years later. A five-year post-indictment delay is not merely presumptively prejudicial - it extends far beyond the approximately one-year threshold ordinarily sufficient to trigger full constitutional review. See *Doggett, supra* 50 U.S. at 652 n.1; *Ingram*, 446 F.3d at 1336.

The recent decision in *Scott, supra*, is particularly instructive. There, a nearly five-year post-indictment delay was sufficient not merely to trigger *Barker*, *supra,* review but ultimately contributed to the court's determination that the first three factors weighed heavily against the Government and warranted dismissal with prejudice. *Scott,* 2025 WL 590045, *supra.*

Moreover, the conduct charged in the Indictment allegedly occurred between October 2014 through 2015 and one alleged act in 2016, arguably not a part of the conduct charged in the Indictment. By the time the Accused was indicted in January 2021, approximately five years had already elapsed since the conclusion of the charged conduct; by the time the Accused was brought before this Court in January 2026, nearly a decade had passed.

Although the Sixth Amendment speedy trial clock does not begin until arrest, indictment, or other formal accusation, once a presumptively prejudicial post-indictment delay triggers the

*Barker* analysis, the Eleventh Circuit permits the Court to consider inordinate pre-indictment delay in determining how heavily the post-indictment delay weighs against the Government. *United States v. Ingram*, 446 F.3d 1332, 1339 (l1th Cir. 2006); see also *United States v. Kirkman*, No. 1 :21-cr-00454-WMR-RGV, 2024 U.S. Dist. LEXIS 228496, at 108-10 (N.D. Ga. May 29, 2024). As *Kirkman* explained, once the Sixth Amendment inquiry has been triggered, an otherwise identical period of post-indictment delay may weigh more heavily where it follows an already substantial period between the alleged criminal conduct and formal accusation.

*United States v. De La Torre*, *supra*, applied the same principle in circumstances particularly relevant here. There, the court considered the age of the underlying allegations in determining how heavily the post-accusation delay weighed and concluded that the earlier passage of time compounded the constitutional harm because witnesses would necessarily be asked to testify from memories already substantially eroded by time. *Supra,* No. 20-20185-CR, 2022 WL 20538953, at 15 (S.D. Fla. Oct. 21, 2022).

That reasoning applies with greater force here. The approximately five-year post-indictment delay was imposed upon allegations already approximately five years old when the Indictment was returned. Thus, unlike a case in which an otherwise comparable post-indictment delay begins shortly after the alleged offense, the Accused is now being required to reconstruct communications, financial transactions, business relationships, and witness recollections concerning events occurring approximately a decade earlier.

The combination is constitutionally significant: an extraordinary five-year post-indictment delay layered upon allegations already approximately five years old when the indictment was returned. *Ingram* treated a two-year post-indictment delay more seriously because it followed an additional two-and-one-half-year pre-indictment period. Here, both periods are substantially longer.

Accordingly, the approximately five-year post-indictment delay—compounded by the age of the underlying allegations—causes the first *Barker* factor to weigh heavily against the Government.

**2. The reason for the delay weighs heavily against the Government**.

The second factor requires the Court to determine why the Accused remained under indictment for approximately five years without being brought before this Court.

The burden belongs to the Government. *Machado*, 886 F.3d at 1080; *Ingram*, 446 F.3d at 1337. And while the Government is not required to "exhaust all conceivable avenues" to locate a defendant, it must make a diligent, good-faith effort to locate and bring him to trial. *Bagga*, 782 F.2d at 1543.

The existing record demonstrates that the Government knew substantially more about BERT WATSON, JR.'s whereabouts than is ordinarily present in a fugitive case. Federal authorities possessed the Accused 's identity and contact information, communicated with him directly, successfully caused him to be arrested in Nicaragua in September 2021, and participated in communications concerning his transfer to the United States. Yet the Accused was subsequently released and remained unprosecuted for years.

The Government therefore cannot explain this case merely by observing that BERT WATSON, JR. was outside the United States.

*Odunna* is particularly instructive. There, as here, the Accused was residing abroad and the Government invoked the difficulties associated with foreign apprehension and extradition. The court recognized that extradition may be difficult but rejected the proposition that difficulty excuses inactivity. The constitutional problem was not the Government's inability to immediately accomplish extradition; it was its failure to make sustained efforts to accomplish it.

The distinction is critical here because the Government had already accomplished what was missing in *Odunna*: it had located BERT WATSON, JR. and caused his arrest. The unexplained question is therefore not why federal authorities could not locate a person somewhere in a foreign country. They did locate him. They knew where he was, communicated concerning his transfer, and thereafter permitted years to pass without bringing him before this Court.

Nor does the Government's obligation disappear merely because a defendant resides outside the United States. *Bagga* expressly recognized that a defendant's absence from the country does not relieve the Government of its obligation to undertake good-faith efforts to secure his return. 782 F.2d at 1543-44.

The cases in which the Eleventh Circuit has found sufficient governmental diligence illustrate what is missing here. In *Bagga*, agents sought information from local police, pursued a lead concerning the defendant's location, entered his information into a nationwide crime network, and established procedures to apprehend him upon his return. Id. In *Machado,* agents attempted arrest at the defendant's last-known residence, visited his former church, placed the warrant into NCIC for border interception, and periodically searched governmental databases for indications that he had returned to the United States. 886 F.3d at 1080—81. And in *Spaulding*, the record demonstrated continuous monitoring and consistent governmental efforts to locate the defendant. 322 F. Appʳx 942, 946-47 (11th Cir. 2009).

Those cases establish the benchmark for constitutionally adequate diligence. They do not excuse inactivity; they demonstrate why inactivity is constitutionally deficient.

Watson's case instead resembles *Ingram, Bell, Contreras, Scott*, and *Odunna*. In *Ingram*, the Eleventh Circuit held that even good-faith efforts were constitutionally insufficient where

they were not diligent. 446 F.3d at 1338—40. In *Bell*, the court dismissed where the Government failed to adequately pursue a defendant who was living openly. 546 F. Supp. 3d at 1143. In *Contreras*, entry of a warrant into NCIC was insufficient where it constituted essentially the Government's only meaningful effort. 586 F. Supp. 3d at 1283-84. In *Scott,* two attempts over nearly five years failed to establish diligence. 2025 WL 590045. And in *Odunna*, years of failure even to attempt foreign apprehension constituted "findable negligence." 818 F. Supp. 3d at 1342-44.

The Government's familiarity with the Accused also substantially predates the present Indictment. Before this prosecution, the Accused voluntarily testified as a Government witness at the *Altomare* trial, a federal prosecution involving Sunset-related matters and members of the same prosecution team responsible for this case. Thus, the Accused was not merely an individual whom federal authorities first encountered during the investigation resulting in this Indictment. The prosecution team had previously dealt directly with the Accused as its own trial witness concerning related Sunset matters.

The present circumstances are more troubling because federal authorities were not searching unsuccessfully for the Accused. They had already found him.

Moreover, the Accused himself reinitiated direct communication with federal authorities. In August 2025, BERT WATSON, JR. contacted Agent Palomares seeking instructions concerning his return to the United States, and in September advised that he lacked the travel documentation necessary to do so. Additionally, the Accused contacted the U.S. Embassy in Managua in January 2026 to arrange a meeting with them (to facilitate his surrender) but was arrested by the Nicaraguan authorities before they could meet.

Those communications are inconsistent with a theory that the remaining delay resulted from successful concealment and underscore the central unanswered question: what efforts the

Government undertook after it had already located and caused the Accused's arrest in 2021. Despite numerous requests for discovery related to this issue, i.e., what efforts did the Government take to bring the Accused before this Court, there have been no documents provided to explain.

The present record does not disclose whether the ensuing delay resulted from diplomatic complications, administrative inaction, prosecutorial decisions, negligence, or some combination thereof. That uncertainty does not benefit the Government, which bears the burden of explaining post-indictment delay. *Ingram*, 446 F.3d at 1337. *Holland* likewise recognizes that the Government must bear responsibility for prosecutorial choices that materially prolong a case and must "live with the strategic decisions it made." 780 F. Supp. 3d at 1314-15. The relevant explanation here lies principally within the Government's possession.

The second *Barker* factor therefore weighs heavily against the Government.

Should the Government contend that the delay was attributable to the Accused or to circumstances beyond governmental control, it should be required to establish that contention through competent evidence at an evidentiary hearing.

### 3. The Accused 's assertion of his rights weighs in his favor

The third factor examines the Accused 's assertion of speedy trial rights, but it does not shift the Government's constitutional obligation to bring the prosecution forward. A defendant's knowledge and conduct are relevant to the inquiry; nevertheless, "[a] defendant has no duty to bring himself to trial." *Ingram,* 446 F.3d at 1337. Conduct consistent with voluntary communication and surrender weighs against an inference of evasion. *Id.* at 1337-38.

Here, the Accused 's conduct does not demonstrate acquiescence in the Government's delay. To the contrary, BERT WATSON, JR.'s August and September 2025 communications as well as his contact with the U.S. Embassy in 2026, referenced above, demonstrate a willingness to resolve the prosecution rather than evade it. He affirmatively contacted federal authorities and sought instructions regarding his return to the United States.

That conduct closely parallels *Ingram*, where the Eleventh Circuit found it significant that the Accused affirmatively contacted the investigating agent and voluntarily surrendered after learning of the indictment. 446 F.3d at 1338-40.

The Accused 's prior history with federal authorities further undermines an inference of flight or evasion. Before the present prosecution, the Accused voluntarily testified as a Government witness in *United States v. Altomare*, (Case No. 0:13-cr-60240-Dimitrouleas), concerning Sunset-related matters. When federal investigators later contacted him in Nicaragua in 2020, he again spoke voluntarily with them, disclosed where he was living, and answered substantive questions concerning Sunset. And in 2025, the Accused himself reinitiated contact with federal authorities seeking instructions concerning his return to the United States. Viewed together, that history of voluntary testimony, open communication, and affirmative contact is inconsistent with an inference that the Accused sought to conceal himself from federal authorities or acquiesced in the Government's prolonged delay.

Nor does the fact that the Accused did not personally invoke the words "speedy trial" during his communications transform those communications into acquiescence. *Barker* rejected a rigid demand-waiver rule. 407 U.S. at 525-28. The relevant inquiry is the totality of the circumstances, including whether the Accused sought to evade prosecution or instead attempted to resolve his status.

The Accused 's pre-appearance communications did not constitute a formal demand for a speedy trial, but they rebut an inference that he acquiesced in the delay or intended to avoid prosecution. After his appearance and after counsel had an opportunity to investigate the unusual procedural history of the case, the Accused formally asserted his constitutional right.

Accordingly, under the totality of the circumstances, the third factor weighs in the Accused 's favor.

**4. The accused has demonstrated actual prejudice; the extraordinary delay further supports a presumption of prejudice**.

The fourth *Barker f*actor strongly favors the Accused because the delay has actually impaired his defense. Moreover, the Supreme Court recognizes that excessive delay carries an increasing presumption of prejudice because "time's erosion of exculpatory evidence and testimony can rarely be shown." *Doggett*, 505 U.S. at 655. Where the first three *Barker* factors weigh heavily against the Government, Eleventh Circuit law dispenses altogether with the requirement of separately proving actual prejudice. *Ingram,* 446 F.3d at 1336, 1339-40; *United States v. Register,* 182 F.3d 820, 827 (11th Cir. 1999). *Scott, Contreras*, and *Odunna* applied that rule where each court found the first three factors weighed heavily against the Government.

The Court need not determine whether the Accused is entitled to rely exclusively upon that presumption, however, because the Accused has demonstrated concrete actual prejudice.
The fourth *Barker* factor considers three protected interests: preventing oppressive pretrial incarceration, minimizing the accused's anxiety and concern, and—most importantly—limiting impairment of the defense. *Barker*, 407 U.S. at 532. Impairment of the defense is the most serious because it "skews the fairness of the entire system." *Id.* Where witnesses die or disappear during the delay, "the prejudice is obvious." *Id.; see also United States v. Edwards*, 577 F.2d 883, 890 (11th Cir. 1978); *Holland*, 780 F. supp. 3d at 1316-23.

Daniel Charles Vaughn, Esq., was the Attorney for Sunset, before, during and after the time frame alleged in the Indictment. Mr. Vaughn is now a retired attorney who has suffered a stroke and having memory issues. His testimony will be presented in furtherance of a Reliance on Counsel defense, a Notice of which will be filed shortly. According to documents provided in discovery, Mr. Vaughn issued many letters and other communications and documents attesting to the value of the gems in question as well as the lawful nature in which Sunset operated.

Significantly, John Bert Watson, Sr. (JOHN WATSON, SR.), the Accused 's father and co-defendant, died during the pendency of this prosecution. As an alleged participant in many of the events underlying the Indictment, JOHN WATSON, SR. possessed first-hand knowledge concerning the formation and operation of Sunset Capital Assets, communications with investors, the roles of the various defendants, and other factual matters central to the Government's allegations. His testimony - whether favorable, unfavorable, or somewhere in between - is now permanently unavailable.

The death of JOHN WATSON, SR. in September 2021, permanently deprived the Accused of potential material testimony concerning the charged events. The passage of time has substantially impaired the Accused's ability to investigate allegations arising from transactions nearly a decade old and to present a fair defense. JOHN WATSON, SR. was the Chairman of the Board, made all major decisions, conducted weekly meetings in his office to discuss business strategies, communicated directly with all the other officers of the corporation, including the CEO, the CFO and the President. He communicated directly and in other ways with Dan Vaugn, the Attorney for the Corporation, the CPA's for the Corporation and with Mr. Govind Prasad (DAS), the owner of the Corporation that owned and possessed the Gems that were at issue in the Indictment. JOHN WATSON, SR., was "the boss." He knew everything. His knowledge of the

workings of Sunset Capital, (a company he purchased years earlier, is irreplaceable. By the time the Government got around to investigating this case and obtaining an Indictment, JOHN WATSON, SR., was terminal and died in September 2021.

In addition to the prejudice described above, the death of Govinda Prasad (DAS) prior to trial - further impairs the defense. Mr. Prasad, a native of India, was the principal of one or more nonprofit corporations that owned gemstones, including rubies and statues. He could have testified about the gems' background and value, including his belief that they were worth more than one billion dollars. He also had knowledge of transactions between his nonprofit entity and HAF Capital, a corporation owned and managed by BERT, SR.

The passing of former Board Member and Real Estate Expert Walter Williams is another significant loss to the defense herein. Mr. Williams would have provided information and testimony to the Real Estate portion of Sunset's portfolio.

The prejudice is not defeated merely because some written records may remain. In *Holland*, the death of a witness central to the defendants 'advice-of-counsel defense materially impaired their ability to present the defense even though certain writings associated with that witness could potentially be introduced through another witness. The court reasoned that documents presented through a different witness would not supply the same testimony or be received by a jury in the same manner as testimony from the deceased participant himself. 780 F. Supp. 3d at 1307-08.

The same principle applies here. Documents cannot recreate John Bert Watson, Sr.'s, or Govind Prasar's, or Walter Williams' personal recollections, explain intent and understanding, permit follow-up questioning, or provide the fact finder with testimony from one of the principal alleged participants.

Importantly, the Supreme Court has recognized that the most serious consequences of excessive delay often cannot be identified with precision because the very passage of time obscures what evidence has disappeared. As the Court explained in *Doggett*, "excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify." 505 U.S. at 655. Likewise, "time's erosion of exculpatory evidence and testimony can rarely be shown. " *Id*.

That principle is particularly applicable here. The Accused has demonstrated concrete, identifiable prejudice through the permanent loss of testimony from his deceased father and co-defendant. JOHN WATSON, SR., the passing of Mr. Govind Prasad, the passing of Walter Williams, as well as the memory decline of Attorney Dan Vaugn. But the Constitution does not require the Accused to identify every witness whose memory has faded, every document that no longer exists, or every piece of exculpatory evidence lost during the passage of nearly decade. To impose such a burden would require proof of the very information that the delay itself has rendered unknowable.

The Accused also suffered substantial personal prejudice during the period of delay. He remained in Nicaragua without valid travel documentation while members of his immediate family resided in the United States. The prolonged separation, uncertainty, and inability to resolve the pending prosecution imposed the type of anxiety and personal disruption recognized by *Barker*. *see* 407 US. at 532; *Holland*, 780 F. supp. 3d at 1322-23.

Accordingly, the Accused has demonstrated actual prejudice through the permanent loss of potentially material testimony, the deterioration and loss of historical evidence, and the personal hardship caused by years of unresolved prosecution. The extraordinary length of the delay further magnifies that prejudice under *Doggett*. The fourth *Barker* factor therefore weighs strongly in favor of dismissal.

**5. The balance of the *Barker* factors requires dismissal.**

Taken together, the *Barker* factors establish a Sixth Amendment violation.

This is not a case in which federal authorities diligently searched for the Accused whose location remained unknown. It is not *Bagga*, where agents pursued multiple leads and established procedures to apprehend the Accused upon his return. It is not *Machado,* where agents conducted periodic database searches and maintained border-interception measures. It is not *Spaulding*, where authorities continuously monitored and pursued the defendant. And it is not *Jimenez*, where legitimate ongoing investigative and diplomatic concerns affirmatively explained the Government's delay.

This case instead resembles *Ingram, Bell, Contreras, Scott*, and *Odunna* cases in which prolonged governmental inaction, rather than unavoidable circumstances or deliberate evasion by the accused, accounted for constitutionally significant delay. And *Holland* and *De La Torre* demonstrate the additional constitutional weight that prolonged delay acquires when it results in unavailable witnesses, deteriorated evidence, faded memories, and the need to defend against already-aged allegations.

Indeed, the circumstances here are unusual even among those cases. Members of the prosecution team had previously dealt directly with the Accused when he voluntarily testified as a Government witness in a Sunset-related federal prosecution. The Government later knew the Accused's location and means of contact, communicated directly with him, and successfully caused his arrest in Nicaragua. It participated in discussions concerning his transfer to the United States. The Accused was nevertheless released. Years passed. And when the Accused himself later contacted federal authorities seeking instructions for returning to the United States, prosecution still was not promptly resolved.

The Sixth Amendment places the obligation to bring an accused to trial upon the Government, not the accused. The Government cannot satisfy that obligation by locating and arresting a defendant, failing to secure his appearance, allowing years to pass, and then attributing the resulting delay to the defendant's foreign residence.

As the Supreme Court cautioned in *Doggett*, condoning prolonged and unjustifiable prosecutorial delay would "penalize many defendants for the state's fault" while encouraging the Government to gamble with the constitutional interests of defendants assigned a low prosecutorial priority. 505 U.S. at 657. *Scott* applied that principle to a nearly five-year delay and dismissed the indictment with prejudice.

The same constitutional result is warranted here.

Because the prosecution bears the burden of explaining post-indictment delay, *Ingram*, 446 F.3d at 1337, and the evidence bearing upon those matters lies principally within the Government's possession, the Court should conduct an evidentiary hearing if it does not dismiss the Indictment on the present record.

## IV. CONCLUSION

This case presents an extraordinary delay between indictment and prosecution. The Government's own filings establish that the Accused was identified before the Indictment, communicated directly with federal investigators, remained known to the Government after charges were returned, was arrested in Nicaragua pursuant to the Government's request, and later initiated communications seeking instructions concerning his return. Yet the Accused was not brought before this Court until approximately five years after the Indictment and nearly a decade after the charged conduct.

Application of the *Barker* factors demonstrates a Sixth Amendment violation. The delay was extraordinary; the Government has not demonstrated that it resulted from any inability to identify, locate, or communicate with the Accused; the Accused 's conduct rebuts an inference of concealment or acquiescence; and the delay caused both substantial actual prejudice and the type of presumptive prejudice recognized in *Doggett.*

The result is consistent with *Ingram, Scott, Odunna, Bell*, and *Contreras*, each of which confirms the Government's constitutional obligation to exercise diligence in bringing an accused to trial. *Holland* and *De La Torre* further demonstrate the consequences of extraordinary delay where witnesses and evidence have been lost, and the underlying allegations have grown increasingly difficult to reconstruct.

Whether the Government's failure resulted from negligence, administrative oversight, diplomatic complications, or other causes, the Constitution does not permit the Accused to bear the irreversible consequences of an extraordinary delay for which the Government bears constitutional responsibility.

Accordingly, dismissal of the Indictment with prejudice is warranted.

WHEREFORE, the Accused, JOHN FRITZBERT WATSON, JR., respectfully requests that this Court:

A. Dismiss the Indictment with prejudice pursuant to the Sixth Amendment to the United States Constitution;

B. Alternatively, conduct an evidentiary hearing concerning the reasons for the extraordinary post-indictment delay and the Government's efforts to secure the Accused's appearance; and

C. Grant such other and further relief as this Court deems just and proper.

Respectfully submitted,

/s/ Christopher A. Grillo
CHRISTOPHER A. GRILLO, ESQ.
LAW FIRM OF CHRISTOPHER A. GRILLO, P.A,.
1 East Broward Blvd., Suite 700
Fort Lauderdale, Florida 33301
Telephone: (954) 524-1125
Email: *chrisgrilloatty@aol.com*
Florida Bar No.: 302661

CERTIFICATE OF SERVICE AND OF COMPLIANCE WITH THE LOCAL RULES

I hereby certify that a true and correct copy of the foregoing was furnished to all parties with the Clerk of the Court via CM/ECF this 13th day of September, 2026.

By: *\/s/ Christopher A. Grillo*
CHRISTOPHER A. GRILLO, ESQ.