**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 21-cr-60019-SMITH**

**UNITED STATES OF AMERICA**

**v.**

**JOHN FRITZBERT WATSON, Jr.,**
**a/k/a "John Bert Watson, Jr.,"**
**a/k/a "J. Bert Watson, Jr.,"**
**a/k/a "Bert Watson, Jr.,"**

**Defendant.**
______________________________________ /

**UNITED STATES' RESPONSE IN OPPOSITION TO THE DEFENDANT'S MOTION TO DISMISS INDICTMENT FOR VIOLATION OF THE SIXTH AMENDMENT**

The United States, by and through its undersigned Assistant United States Attorney, hereby responds in opposition to the Defendant's Motion to Dismiss Indictment for Violation of the Sixth Amendment (DE 307) (the "Motion to Dismiss"), and states:

**STATEMENT OF FACTS**

On January 19, 2021, the grand jury returned the seven-count Indictment which charges the defendant, John Fritzbert Watson, Jr. ("Watson"), with conspiracy to commit mail fraud and wire fraud, in violation of Title 18, United States Code, Section 1349, conspiracy to commit securities fraud, in violation of Title 18, United States Code, Section 371, and five counts of securities fraud, in violation of Title 15, United States Code, Section 77q(a) and 77x. (*See* Indictment (DE 1).) The charged offenses arise from Watson's involvement in the private placement (offering) of common stock issued by Sunset Capital Assets, Inc., which commenced in October 2014 and continued through April 2016. (*See, e.g., id.*, Count 1 at pp. 1-9.)

U.S. Customs and Border Protection ("CBP") records disclose that on October 17, 2017, Watson flew from Fort Lauderdale Airport to Augusto C. Sandino Airport in Managua, Nicaragua.

Watson then remained outside the United States until January 20, 2026, when he flew from Managua to Miami International Airport. (*See* Exhibit 1, Customs and Border Protection TECS Person Encounter List.) FBI Special Agents arrested Watson when he arrived in Miami.

On January 21, 2026, Watson made his initial appearance before Magistrate Judge Patrick Hunt in Fort Lauderdale. (*See* Minute Order (DE 256).) Eight months later, on September 13, 2026, Watson filed the instant Motion to Dismiss. In the introduction to the motion, Watson alleges the following facts in support of his motion:

> Although the Government has consistently characterized the accused, BERT WATSON, JR., as a fugitive who remained outside the United States after Indictment, the Government's own filings establish a markedly different chronology.
>
> Indeed, the Government's familiarity with the Accused substantially predated the investigation resulting in this Indictment. BERT WATSON, JR. had previously voluntarily testified as a Government witness in a Sunset-related federal prosecution involving members of the same prosecution office in February 2014.
>
> **Long before returning the Indictment, federal investigators had identified the Accused, knew precisely where he resided and possessed his telephone number and email address.** Mr. Watson provided his full name, date of birth, Social Security number and his address in the United States. An FBI Agent communicated with Mr. Watson via e-mail, and, in fact, Mr. Watson called the Agent on July 1, 2020. During that interview, the Accused disclosed his residence, answered investigators' questions, and communicated directly with the Federal Bureau of Investigation. **Nevertheless, the Accused was not brought before this Court until January 2026, more than five years after the Indictment was returned. During that period, the Government knew Mr. Watson's whereabouts, maintained direct communications with him, and possessed repeated opportunities to secure his appearance.** Yet approximately five years elapsed before the Accused was brought before this Court. …
>
> **Because the Government knew the Accused's whereabouts, maintained direct communication with him, and successfully procured his arrest through foreign authorities, the resulting five-year post-indictment delay cannot simply be attributed to an unavailable defendant.** Rather, it must be examined under the balancing framework established in *Barker v. Wingo*, 407 U.S. 514 (1972), and *Doggett v. United States*, 505 U.S. 647 (1992), and applied by the Eleventh Circuit in *United States v. Register*, 182 F.3d 820 (11th Cir. 1999), and *United States v. Ingram*, 446 F.3d 1332 (11th Cir. 2006).

(Motion to Dismiss (DE 307) at pp. 2-3 (emphasis added).)

Watson's allegations are misleading. Watson's reference to his testimony at the trial of *United States v. Altomare*, in February 2014, and his declaration that "**long before returning the Indictment, federal investigators had identified the Accused**, **knew precisely where he resided and possessed his telephone number and email address**, create the false impression that the United States knew of Watson's offenses years before obtaining the Indictment, but ignored them because he was a government witness in *Altomare*. But that is false. Watson's testimony in *Altomare* is irrelevant because he testified seven months before he began his commission of the offenses charged in this case, and the government discovered his involvement in the offenses in or around 2020, during the COVID 19 pandemic. Likewise, Watson's declaration that the government "**maintained direct communications with him**" between the return of the Indictment in January 2021, and his return to the United States in January 2026, suggests the FBI was in frequent contact with him throughout his time in Nicaragua. That too is false.

1. **Watson Learns of the Investigation and the Indictment**

On June 30, 2020, FBI Special Agent Alonzo Palomares initiated contact with Watson, via email. (*See* Exhibit 2, Emails between Agent Palomares and Watson, dated June 30, and July 1 and 3, 2020, at p. 3.) After exchanging emails, Agent Palomares and Watson spoke on July 1, 2020; however, the call ended when Agent Palomares began questioning Watson about Jabez Capital Holdings, LLC ("Jabez"), a shell company that Watson used to divert approximately $1.3 million of investor funds to himself and his co-conspirators. Agent Palomares sent an email to Watson, asking Watson to call him back. On July 3, 2020, Watson replied that he would call Agent Palomares the next week. (*Id.* at 1.) But Watson did not call Agent Palomares, because

during their call on July 1, 2020, he realized that the FBI was investigating the offenses charged in this case and hung up the phone.

Agent Palomares wrote an FBI Form 302 report of investigation regarding his telephonic interview of Watson on July 1, 2020. (*See* Exhibit 3, FBI 302.) The report records various admissions by Watson, including the following: Watson was residing on his friend's coffee plantation at "Kilometer 13, Plantation, Managua, Nicaragua;" Sunset's assets were "basically nothing," and the company "only has the title business right now;" Watson's compensation at Sunset was "small" and he was reimbursed for expenses; "some people were getting paid commissions for getting transactions completed;" and Jabez was a company he once owned and "used to make payments," and "it does nothing, just a holding company." (*Id.* at pp. 1, 3, 4.)

Evidence the government presented at the trial of Watson's co-defendants, Jeffrey Horn and Omar Plummer, shows that Watson diverted most of the proceeds from the Sunset offering to bank accounts he controlled, including Jabez's TD Bank account, which he used as a conduit to misappropriate the offering proceeds. (*See* Government's Exhibit 41, Flow of Funds, Excerpt.) Thus, when Watson relocated to Nicaragua in October 2017, he knew that he had misappropriated most of the Sunset offering proceeds and was subject to prosecution for doing so.

On January 27, 2021, Agent Palomares sent an email to Watson, with a copy of the Indictment attached. Agent Palomares wrote:

> Mr. Watson,
>
> I attempted to speak with you by calling your 904-322-2283 number.
>
> As you can see in the attached document, you, your father, and others have been charged with several federal fraud counts in connection with the Sunset Capital Assets, Inc. stock offering. Your father was arrested this morning. There is a warrant out for your arrest.
>
> As I understand, you are currently residing overseas in Nicaragua.

> I strongly recommend that you contact me as soon as possible so that we may arrange for your self-surrender.

(Exhibit 4, Email from Agent Palomares to Watson, dated January 27, 2021.)

**2. <u>The Death of John Bert Watson, Sr.</u>**

Watson's father and co-defendant, John Bert Watson, Sr. ("Watson, Sr."), was released on bond. On June 10, 2021, Watson, Sr. filed an unopposed motion for permission to travel to Michigan to visit family and friends. As grounds, Watson, Sr. told the Court that he had a terminal illness and had been informed by his doctors that his life expectancy was two months. (*See* Unopposed Motion to Travel (DE 58) at p. 1, ¶ 4.)

On September 4, 2021, Watson, Sr. passed away at his home in Florida. (*See* Exhibit 5, Obituary of John Bert Watson, Sr.) According to CBP records, Watson did not visit his father before his father died, and he did not attend his father's funeral or celebration of life. Watson remained outside of the United States to avoid arrest and prosecution in this case.

**3. <u>Nicaragua Arrests and Releases Watson</u>**

On July 2, 2021, Agent Palomares and the undersigned AUSA appeared before then Chief United States Magistrate Judge John J. O'Sullivan and swore affidavits in support of a formal request to Nicaragua for the extradition of Watson. The undersigned AUSA sent the affidavits and other parts of the extradition package to the Department of Justice Office of International Affairs ("OIA") in Washington, D.C. On July 12, 2021, OIA acknowledged receipt of the package.

On July 22, 2021, OIA advised the undersigned AUSA that the extradition package had been translated into Spanish.

On August 5, 2021, OIA submitted the request for the extradition of Watson to the U.S. Department of State. (*See* Exhibit 6, Email from OIA to AUSA Williams, dated August 6, 2021, confirming transfer of extradition package to U.S. Department of State.)

On August 17, 2021, Agent Palomares entered Watson's arrest warrant into the National Crime Information Center ("NCIC") database.

On August 31, 2021, Agent Palomares sent a request for a "red notice" for Watson to Interpol.[1] (*See* Exhibit 7, Interpol New Red Notice Request Confirmation, dated August 31, 2021.) Thereafter, Interpol issued a red notice.

In August 2021, OIA and/or the U.S. Department of State decided to ask Nicaragua to arrest and deport Watson, rather than extraditing him. According to U.S. Department of State, Diplomatic Security Services ("DSS") Special Agent Jacob Ritzler, in 2020, the United States submitted a formal request to Nicaragua for the extradition of an unrelated defendant, a Nicaraguan citizen who was charged in California with committing lewd and lascivious acts on minor victims. Nicaragua proposed to exchange the alleged sex offender for a dual U.S. Nicaraguan citizen, "John Doe," who was resident in the United States. The United States rejected Nicaragua's proposal and later withdrew its extradition request because the alleged sex offender died. Based in part on this episode, the government decided that a request for Watson's arrest and deportation, based on his lack of status in Nicaragua, would be more likely to succeed.

On September 3, 2021, at the request of the United States, but not pursuant to extradition, Nicaraguan police arrested Watson for the purpose of deporting him to the United States. (*See* Exhibit 8, Emails from DSS Special Agent Ritzler to Agent Palomares and AUSA Williams, dated September 4, 6, and 7, 2021, at p. 2.) On or about September 6, 2021, the Government of Nicaragua ("GON") sought to tie the deportation of Watson to the arrest and extradition of John

[1] "A Red Notice is a request to law enforcement worldwide to locate and provisionally arrest a person pending extradition, surrender, or similar legal action. A Red Notice is not an international arrest warrant. The individuals are wanted by the requesting member country, or international tribunal. Member countries apply their own laws in deciding whether to arrest a person." https://www.interpol.int/en/How-we-work/Notices/Red-Notices/View-Red-Notices.

Doe from the United States. (*Id.*, Email from SA Ritzler to AUSA Williams and Agent Palomares, dated September 6, 2021.) On September 7, 2021, Agent Palomares responded, asking Agent Ritzler whether the FBI could assist. Agent Ritzler replied:

> No. The GON keep trying to make fugitive cases political by linking them to one of their "fugitives" who is really a victim of political persecution. Plus he is a US cit, so we will not extradite him. The last time they tried this we responded stating that the two matters were separate cases that should not be linked.

(*Id.*, Email from Agent Palomares to Agent Ritzler, dated September 7, 2021; Ritzler's reply.)

The United States rejected Nicaragua's proposal, and Nicaragua released Watson. (*See* Exhibit 9, Email from DSS Special Agent Ritzler, dated September 14, 2021.) According to DSS Special Agent Erinn Fischer, after Nicaragua released Watson, Nicaragua paused extraditions and deportations to the United States for approximately four years.[2]

**4. <u>Nicaragua Deports Watson to the United States</u>**

On April 11, 2025, Diplomatic Security Services, in Managua, Nicaragua, sent an email to the Nicaraguan Ministry of the Interior, requesting movement information for several persons, including Watson. (*See* Exhibit 10, Emails between DSS and Nicaraguan Ministry of the Interior, dated April 11 and 12, 2025, at p. 3.) On April 12, 2025, Nicaragua advised that Watson had last entered Nicaragua on February 22, 2020, from Costa Rica. (*Id.* at p. 2.)

On August 30, 2025, Watson responded to Agent Palomares' email of January 27, 2021. Watson wrote, "So what is process to return to USA? (*See* Exhibit 11, Emails between Watson and Agent Palomares, dated August 30, and September 2, 2025, at p. 2.) On September 2, 2025, Agent Palomares replied, "Mr. Watson, you can simply fly into Miami International Airport and

[2] According to Agent Ritzler, following the release of Watson, Nicaragua restricted the U.S. government's communications regarding fugitives to the Chief of the Nicaraguan Police. In or around July 2023, a DSS agent in Managua inquired with the Chief regarding Watson's whereabouts, and the chief advised that Watson was under house arrest.

the FBI can meet you there. You just need to provide us with the flight information." (*Id.* at p. 1.) Watson wrote back, "Have no passport or valid Id?" (*Id.*) Notably, Watson did not go to the United States Embassy in Managua to obtain a U.S. passport. Watson's failure to visit the Embassy suggests he had no intention to return to the United States. Watson had started a new family in Nicaragua and may have believed that if he entered the embassy, he would be arrested.

On January 12, 2026, DSS Special Agent Erinn Fischer wrote to the Nicaraguan Ministry of the Interior, requesting they arrest Watson and return him to the United States for prosecution in this case, but not by extradition. (*See* Exhibit 12, Agent Fischer's letter to the Nicaraguan Ministry of the Interior, dated January 12, 2026; Exhibit 12.1, Arrest Warrant.) According to Agent Fischer, Nicaraguan police could not locate Watson because he had changed his residence. Watson contacted the U.S. Embassy and spoke with Agent Fischer, who offered to pick him up and bring him to the Embassy. But Agent Fischer's offer was a ruse. Watson texted his location information to Agent Fischer who then forwarded that information to the Nicaraguan police.

On or about January 14, 2026, Nicaraguan police arrested Watson. On January 20, 2026, Nicaragua deported Watson; he returned to the United States via an American Airlines flight to Miami International Airport where he was arrested by FBI agents. (*See* Exhibit 1, at p. 1.) At the time of his arrest, Watson told the agents that he had a wife and two children in Nicaragua.

## MEMORANDUM OF LAW

The Eleventh Circuit's opinion in *United States v. Ogiekpolor*, provides a helpful statement of its application of *Barker v. Wingo* and progeny to alleged violations of the Sixth Amendment right to a speedy trial. The court began:

> The Sixth Amendment to the Constitution guarantees a defendant "the right to a speedy and public trial." U.S. Const. amend. VI. If a trial is unreasonably delayed, "a court must set aside any judgment of conviction, vacate any sentence imposed, and dismiss the indictment." *Villarreal*, 613 F.3d at 1349. To determine whether

> a defendant has been deprived of his constitutional right to a speedy trial, courts weigh four factors: (1) the length of the delay, (2) the reason for the delay, (3) the defendant's assertion of his right, and (4) the prejudice to the defendant. *Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). "In this circuit, a defendant generally must show actual prejudice unless the first three factors in *Barker* all weigh heavily against the government." *United States v. Davenport*, 935 F.2d 1223, 1239 (11th Cir. 1991). …
>
> We begin by considering the first factor, the length of the delay. As we have explained, this factor "serves a triggering function: it must first be satisfied for the court to analyze the other factors." *United States v. Oliva*, 909 F.3d 1292, 1298 (11th Cir. 2018) (citing *Villarreal*, 613 F.3d at 1350). A delay exceeding one year is "presumptively prejudicial." *United States v. Ingram*, 446 F.3d 1332, 1336 (11th Cir. 2006) (quoting *Doggett v. United States*, 505 U.S. 647, 652 n.1, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992)). …

*United States v. Ogiekpolor*, 122 F.4th 1296, 1305 (11th Cir. 2024) (citing *United States v. Villarreal*, 613 F.3d 1344 (11th Cir. 2010) (delay of approximately ten years between indictment and defendant's motion to dismiss did not violate Sixth Amendment right to speedy trial).

Significantly, the *Okiekpolor* court stated that the second *Barker* factor (the reason for delay) determines the weight assigned to the first and the third *Barker* factors:

> **We have explained that even when the length of delay is presumptively prejudicial, it does not weigh heavily against the government unless the second factor, the reason for the delay, also weighs against the government**. *See, e.g.*, *United States v. Vargas*, 97 F.4th 1277, 1290 (11th Cir. 2024) ("[I]t is particularly necessary to examine the length of the delay alongside the reasons behind it because there were different forces at work for different parts of the delay."); *United States v. Stapleton*, 39 F.4th 1320, 1327 (11th Cir. 2022) ("[T]he length of delay doesn't weigh *heavily* against the Government unless the *reason* for the delay also weighs against the Government." (emphasis in original)), *cert. denied*, – U.S. –, 143 S. Ct. 2693, 216 L.Ed.2d 1257 (2023). …
>
> **Under our precedent, whether a defendant's assertion of his speedy trial right weighs heavily against the government depends on the facts relevant to *Barker* factor two**. *Compare Ingram*, 446 F.3d at 1335, 1338–40 (holding that the third factor weighed heavily against the government where the government was responsible for the delay and the defendant had asserted his right to a speedy trial soon after learning of the indictment and arrest warrant), *with Register*, 182 F.3d at 828 (concluding that the third *Barker* factor did not weigh heavily against the government where the defendant had asserted his right to a speedy trial but also moved for four continuances before trial). The district court concluded that *Register* was more applicable to this case than *Ingram* because Ogiekpolor was

> largely responsible for the delay in proceedings. Because the district court did not clearly err in finding that he caused a substantial part of the delay, we agree with the district court that this factor does not weigh heavily against the government.

*Ogiekpolor*, 122 F.4th at 1305-06, 1307 (emphasis added) (citing *United States v. Register*, 182 F.3d 820 (11th Cir. 1999)). Thus, the government begins its analysis with the second factor.

**The Second *Barker* Factor, the Reason for the Delay**

The government submits that Watson fled to Nicaragua to avoid prosecution for his misappropriation of the Sunset offering proceeds; and that after January 27, 2021, he remained in Nicaragua to avoid arrest and prosecution for the offenses charged in the Indictment. But whatever Watson's motive when he first went to Nicaragua, he became a fugitive from January 27, 2021, when he learned of the Indictment and the warrant for his arrest but did not return to the United States. As the Second Circuit stated when it affirmed the district court's denial of famous drug-trafficker Griselda Blanco's motion to dismiss, based on a post-indictment delay of over ten years:

> Despite her knowledge of the outstanding indictment, Blanco chose to become a fugitive. A person can be said to be a fugitive when, while abroad, they learn that they are under indictment and make no effort to return to the United States to face charges. *United States v. Schreiber,* 535 F. Supp. 1359, 1363 (S.D.N.Y.1982). Blanco clearly made no effort to return to the United States to face charges. Further, her use of a false name and other evasive techniques while in California between September 1984 and February 1985 supports the government's contention that before she was arrested Blanco had no interest in a trial, speedy or otherwise. …
>
> Coming from a former fugitive, Blanco's claim that her right to a speedy trial was denied carries almost no weight. …

*United States v. Blanco*, 861 F.2d 773, 779-80 (2d Cir. 1988). *See also United States v. Shalhoub*, 855 F.3d 1255, 1263 (11th Cir. 2017) ("[W]e have held that a 'defendant need not leave the jurisdiction' for the doctrine of fugitive disentitlement to apply. … '[W]hile legally outside the jurisdiction[. the defendant] may constructively flee by deciding not to return.'") (quoting *United States v. Barnette*, 129 F.3d 1179, 1184 (11th Cir. 1997)).

The second *Barker* factor weighs against Watson, because he was a fugitive in Nicaragua:

> "A defendant has no duty to bring himself to trial; the [Government] has that duty ...." *Barker,* 407 U.S. at 527, 92 S.Ct. at 2190. "Because the prosecutor and the court have an affirmative constitutional obligation to try the defendant in a timely manner ... the burden is on the prosecution to explain the cause of the pre-trial delay." *United States v. Brown,* 169 F.3d 344, 349 (6th Cir. 1999) (citation and internal quotation marks omitted). **However, a defendant who intentionally evades the Government's efforts to bring him to trial is culpable in causing the delay**. *See id.; Rayborn v. Scully,* 858 F.2d 84, 90 (2d Cir.1988) ("While it is true that a defendant is not under any obligation to take affirmative steps to ensure that he will be tried in a timely fashion, a court need not ignore a defendant's fugitivity in considering whether there has been a violation of his sixth amendment right to a speedy trial.") (citation omitted).

*United States v. Ingram*, 446 F.3d 1332, 1337 (11th Cir. 2006). *See also United States v. Villarreal*, 613 F.3d 1344, 1351 (11th Cir. 2010) ("A government's inability to arrest or try a defendant because of the defendant's own evasive tactics constitutes a valid reason for delay.") (citing *Ingram*, 446 F.3d at 1337).

Further, the record shows the United States was diligent in its efforts to return Watson to the United States. The FBI entered Watson's information into the NCIC and submitted a red notice to Interpol soon after the Indictment was returned. The government prepared an extradition package and submitted the package to the Department of State but elected not to pursue formal extradition based on its experience with Nicaragua. In September 2021, the government persuaded Nicaragua to arrest Watson, but was unable to obtain his deportation to the United States without arresting and exchanging an American citizen for Watson. When the government rejected the proposed swap, Nicaragua released Watson. At that point, the United States had no further duty to pursue extradition or deportation, as both methods of returning Watson appeared to be futile. *See United States v. Bagga*, 782 F.2d 1541, 1543 (11th Cir. 1986) (the government has an obligation to make good faith efforts to have a fugitive defendant returned, "[b]ut such efforts do not require the government to pursue futile legal gestures" – rejecting defendant's argument that

the United States should have sought his extradition from India); *United States v. Cabral*, 979 F.3d 150, 158-59 (2d Cir. 2020) (United States made diligent effort to arrest Brazilian in Brazil; but United States had no obligation to seek extradition of defendant, because request for extradition would have been futile) (citing *United States v. Diacolios*, 837 F.2d 79, 83 (2d Cir. 1988) ("[W]e are aware of no case that holds that a formal request for extradition must be made before due diligence can be found to have existed. Due diligence surely does not require the government to pursue that which is futile")); *United States v. Corona-Verbera*, 509 F.3d 1105, 1114-15 (9th Cir. 2007) (United States had no duty to seek extradition of defendant from Mexico, when it would be futile; government was diligent when it entered defendant in NCIC and border computer system); *Blanco*, 861 F.2d at 778-79 (United States had no duty to request the extradition of Blanco from Colombia because the request would have been futile) (citing *United States v. Diacolios*, 837 F.2d. at 83)). Nonetheless, the United States did not give up, it made inquiries with Nicaragua regarding Watson's whereabouts, and in January 2026, Nicaragua granted the United States' request for Watson's arrest and deportation with no conditions attached. In these circumstances, the Court should find that United States was diligent and is not responsible for the delay.

**The First *Barker* Factor, the Length of the Delay**

Applying *Ingram*, the second *Barker* factor (the reason for the delay) weighs against Watson because he went to Nicaragua and remained there to evade arrest and prosecution. Therefore, following *Ogiekpolor*, the first *Barker* factor (length of delay) does not weigh heavily against the government. *See Ogiekpolor*, 122 F.4th at 1305 ("We have explained that even when the length of delay is presumptively prejudicial, it does not weigh heavily against the government unless the second factor, the reason for the delay, also weighs against the government").

**The Third *Barker* Factor, Watson's Assertion of His Right to a Speedy Trial**

The third *Barker* factor (the defendant's assertion of his Sixth Amendment right to speedy trial) weighs heavily against Watson for two reasons: (1) Watson is responsible for his five-year absence from the United States from the return of the Indictment to his return on January 20, 2026; and (2) on January 27, 2021, Watson received an email from Agent Palomares advising him that he and his father had been indicted, with a copy of the Indictment attached. (*See* Exhibit 4.) *See Doggett v. United States*, 505 U.S. 647, 653, 112 S.Ct. 2686, 2691, 120 L.Ed.2d 520 (1992) ("The Government goes against the record again in suggesting that Doggett knew of his indictment years before he was arrested. Were this true, *Barker*'s third factor, concerning invocation of the right to a speedy trial would be weighed heavily against him."); *United States v. Resnik*, No. 92-cr-00394-Altonaga, 2014 WL 1463469, at *5 (S.D. Fla. Apr. 14, 2014) (finding third factor weighed heavily against defendant who knew of his indictment years before he was arrested, remained in Colombia for twenty-one years, and did not assert his right to a speedy trial until after he was arrested) (citing *Doggett*, 505 U.S. at 653 (explaining that if the defendant knew of his indictment years before he was arrested, the third factor "would be weighed heavily against him")).

**The Fourth *Barker* Factor, Actual Prejudice**

Watson must show actual prejudice unless the first three *Barker* factors all weigh heavily against the government. *See Ogiekpolor*, 122 F.4th at 1305 ("In this circuit, a defendant generally must show actual prejudice unless the first three factors in *Barker* all weigh heavily against the government.") (citing *United States v. Davenport*, 935 F.2d 1223, 1239 (11th Cir. 1991)); *United States v. Vargas*, 97 F.4th 1277, 1288-89 (11th Cir. 2024)(same) (citing cases).

Here, the first, second, and third *Barker* factors do not weigh heavily against the government. The second and third factors weigh against Watson, and the third factor weighs

heavily against him. Besides, even if the Court could find that Watson was not a fugitive and the government was negligent, the second factor would not weigh heavily against the government because Watson was absent from the jurisdiction when the Indictment was returned:

> We've emphasized that the Sixth Amendment requires only a diligent, good-faith effort on behalf of the government to locate and bring a defendant to trial. *United States v. Machado*, 886 F.3d 1070, 1080 (11th Cir. 2018); *see also Smith v. Hooey*, 393 U.S. 374, 383, 89 S.Ct. 575, 21 L.Ed.2d 607 (1969). When the government fails to pursue a defendant diligently, its negligence will weigh less heavily when it acted in good faith. *Villarreal*, 613 F.3d at 1351. **The government's negligence also weighs less heavily when "the defendant was at liberty and outside the jurisdiction where the indictment was returned."** *United States v. Bagga*, 782 F.2d 1541, 1544 (11th Cir. 1986).

*United States v. Vargas*, 97 F.4th 1277, 1287-88 (11th Cir. 2024) (emphasis added). Therefore, Watson must show actual prejudice.

To show actual prejudice, a defendant must show (1) oppressive pretrial incarceration, (2) his own anxiety and concern, or (3) the possibility that his defense was impaired because of the delay. *See Ogiekpolor*, 122 F.4th at 1307 (citing *United States v. Machado*, 886 F.3d 1070, 1081-82 (11th Cir. 2018)). Watson relies on the third factor. He argues that his defense was impaired by the incapacity or death of four witnesses. (*See* Motion to Dismiss (DE 307) at pp. 23-25.) He fails to show that the post-indictment delay deprived him of any of the witnesses' testimony.

Watson says that Sunset's former attorney, Daniel Vaughn, Esq., "is now a retired attorney who has suffered a stroke and [is] having memory issues," and that "Mr. Vaughn issued many letters and other communications and documents attesting to the values of the gems in question as well as the lawful nature in which Sunset operated." (Motion (DE 307) at 23.) Nonetheless, Vaughn is available, and Watson says "[h]is testimony will be presented in furtherance of a Reliance on Counsel defense, a Notice of which will be filed shortly." (*Id.*) In these circumstances, Watson's conclusory allegation that Vaughn is having memory issues is insufficient to support any finding of prejudice. *See United States v. Hayes*, 40 F.3d 362, 366

(11th Cir. 1994) ("This court has consistently held that conclusory assertions of prejudice, including unsubstantiated allegations of witnesses' faded memories, are insufficient to constitute proof of actual prejudice.") (citing *United States v. Young*, 906 F.2d 615, 620 (11th Cir. 1990); *United States v. Russo*, 796 F.2d 1443, 1451 (11th Cir. 1986)); *United States v. Machado*, 886 F.3d 1070, 1082 (11th Cir. 2018) ("mere conclusory allegations are insufficient to establish actual prejudice") (citing *Hayes*, 40 F.3d at 366); *see also*, *United States v. Galardi*, 476 F.2d 1072, 1075 (9th Cir. 1973) (trial court properly found that defendants' conclusive allegation of dimmed memory was insufficient to show prejudice to support claims of pre-indictment and post-indictment delay).

Watson next argues that his defense was impaired because his father, John Bert Watson, Sr., died in September 2021, thereby depriving him of "potential material testimony concerning the charged events." (*See* Motion (DE 307) at pp. 23-24.) This claim of impairment is frivolous for at least three reasons. First, Watson, Sr. was a co-defendant; therefore, as long as he maintained his plea of not guilty, he would not have been available to testify as a defense witness.

Second, the five-year post-indictment delay that Watson complains of did not cause the loss of his father's testimony. Watson, Sr. died less than eight months after the Indictment was returned. For most of that period, the United States District Court for the Southern District of Florida had suspended all or most jury trials and had excluded the time to September 6, 2021, from the Speedy Trial Act seventy-day limitation period.[3] In addition, Watson, Sr. was gravely ill and

[3] *See* Admin. Order 2020-76, at p. 2, ¶ 6 (continuing all jury trials until April 5, 2021); Admin. Order 2021-12, at p. 2, ¶ 6 (continuing all jury trials to May 3, 2021); Admin. Order 2021-33, at p. 2, ¶ 6 (continuing all jury trials to July 6, 2021, excluding preselected pilot trials); Admin. Order 2021-50, at p. 2, ¶ 6 (continuing all jury trials to July 19, 2021, excluding preselected pilot trials); Admin. Order 2021-65, dated July 8, 2021, at p. 2, ¶ 5 (noting that approximately 703 cases were awaiting jury trials, and excluding the time from July 19, 2021, to September 6, 2021, from the Speedy Trial Act limitation period).

probably unable to stand trial. Thus, even if Watson had been in the United States when his father, Horn, and Plummer were arrested, it is unlikely that the trial would have commenced before Watson, Sr. died. Indeed, Horn and Plummer did not proceed to trial until 2022.

Third, the period of less than eight months that elapsed between the return of the Indictment and Watson, Sr.'s death would have been insufficient to trigger an analysis of the *Barker* factors. *See United States v. Palanco*, No. 24-10257, 2025 WL 1024791, at *8 (11th Cir. Apr. 7, 2025) ("A delay 'approach[ing] one year' is considered 'presumptively prejudicial.' … An eight-month delay, however, is 'insufficient to merit a Sixth Amendment speedy trial violation inquiry.'") (citing, *inter alia*, *United State v. Derose*, 74 F.3d 1177, 1185 (11th Cir. 1996)). Therefore, Watson, Sr.'s death does not support Watson's claim that the government violated his Sixth Amendment right to a speedy trial.

Watson refers to two other witnesses – Govind Das, also known as Govind Prasad, and Walter Williams – who, he says, may have testified at his trial, if the government had secured his earlier return to the United States. (*See* Motion (DE 307) at p. 24.) Here again, the five-year post-indictment delay did not cause the loss of Das's and Williams' testimony.

The United States served Govind Das with a trial subpoena for the trial of Horn and Plummer. Das then retained attorney Nouvelle Gonzalo, Esq., who sent an email to undersigned counsel, with a medical note from Palms Medical Group, stating that Das could not travel by plane. (*See* Exhibit 13, Email from Nouvelle Gonzalo, Esq., to AUSA Williams, dated April 6, 2022; Exhibit 13.1, Note from Palms Medical Group.) Undersigned counsel recalls that ultimately, Das's family advised he would not come to court; and on April 9, 2022, undersigned counsel received an email purportedly written by Das, with the same medical note attached, declaring that he would not appear. (*See* Exhibit 14, Email from Govind Das, dated April 9, 2022.) In the event, Das did

not obey the United States' trial subpoena. Thus, there is no reason to believe that he would have obeyed Watson's trial subpoena.

Besides, the United States subpoenaed Das to testify against Horn and Plummer, because the undersigned AUSA understood that Das's testimony would assist the government. Among other things, undersigned counsel recalls he expected Das to testify that he remained the owner of the gems that Watson represented as belonging to Sunset. Thus, Watson's claim that Das's death impairs his defense is mere speculation and insufficient to show actual prejudice. *See United States v. VeVea*, 446 F. App'x 63, 66 (9th Cir. 2011) (holding that defendant's assertion that he was prejudiced by the death of a prospective was speculative) (citing *United States v. Tanh Huu Lam*, 251 F.3d 852, 860 (9th Cir. 2001) (stating that a defendant's "contentions regarding alleged defects in witness testimony or lost evidence amount at most to speculation and fail to demonstrate any actual prejudice to his defense")).

Watson argues that he is actually prejudiced by the death of prospective witness Walter Williams. But Watson does not tell the Court when Mr. Williams passed away. The truth is that Walter Williams died on September 30, 2020, more than three months **before** the return of the Indictment. (*See* Exhibit 15, Obituary for Walter Lee Williams, Jr.) Thus, the post-indictment delay did not cause Williams' unavailability.

Watson fails to show actual prejudice; therefore, his Sixth Amendment claim is meritless, and his motion to dismiss should be denied. *See United States v. Walden*, 778 F. Supp. 3d 1236, 1241 (M.D. Fla. 2025) (even though first three *Barker* factors weighed against the government, extraordinary remedy of dismissing the indictment on speedy trial grounds was unwarranted because defendant failed to show actual prejudice) (citing *United States v. Vargas*, 97 F.4th 1277, 1291 (11th Cir. 2025));

**Cases Cited by Watson are Distinguishable**

Watson cites various Eleventh Circuit appellate and district court cases as support for his Sixth Amendment claim; however, those cases are distinguishable. For example, in *United States v. Scott*, No. 19-cr-302-TPB, 2025 WL 590045 (M.D. Fla. Feb. 24, 2025), *United States v. Bell*, 546 F. Supp. 3d 1136 (S.D. Fla. 2021), *United States v. Orozco Contreras*, 586 F. Supp. 3d 1272 (S.D. Fla. 2022), *United States v. Holland*, 780 F. Supp. 3d 1287 (N.D. Ga. 2025), the defendants were in the United States during the alleged violation of their right to a speedy trial. Here, Watson was in Nicaragua, and Nicaragua was not cooperative with the United States.

In *United States v. Odunna*, 818 F. Supp. 3d 1333 (S.D. Fla. 2025), a grand jury indicted Odunna in 2014, but he had moved to Nigeria in 2011. *Id.* at 1336-37. In 2024, Nigeria arrested Odunna. Odunna then waived extradition and returned to the United States in March 2025. *Id.* at 1338. On March 7, 2025, Odunna made his initial appearance in this district; and on September 30, 2025, he moved to dismiss his indictment on the ground that the ten-year post-indictment delay violated his Sixth Amendment right to a speedy trial. *Id.* District Judge Rodolfo A. Ruiz, II, granted Odunna's motion to dismiss, based on his findings that the first three *Barker* factors weighed heavily against the government. *Id.* at 1338-46. As to the second *Barker* factor (reason for the delay), the court stated:

> Here, the Government has failed to provide any basis for the extreme delay between indicting Defendant and bringing him to trial. Of particular concern is the seven-year period from 2014 to 2021, during which time the Government concedes it made no effort to locate and extradite Defendant. …

*See Odunna*, 818 F. Supp. 3d at 1340. Regarding the third factor (the defendant's assertion of his Sixth Amendment right to a speedy trial), the court stated:

> In *Doggett*, the Supreme Court suggested that this factor would weigh against a defendant who knew about his indictment years before he was arrested. 505 U.S. at 653, 112 S.Ct. 2686. However, the government bears the evidentiary burden of proving the defendant's knowledge of an indictment. *See Barker*, 407 U.S. at 529,

> 92 S.Ct. 2182; *see also United States v. Velazquez*, 749 F.3d 161, 184 (3d Cir. 2014) ("Having identified knowledge of the indictment as the appropriate measure for the timely assertion of the speedy trial right, we turn to the evidence in the record, keeping in mind the government's burden to demonstrate [defendant's] knowledge."). …
>
> The Government argues that "Odunna's alleged desire for a speedy trial is inconsistent with his initial obstruction, his continued presence in Nigeria, and his history of refusing to return to the United States." Response at 19. But none of these facts establish Defendant's knowledge of the indictment, especially considering the "initial obstruction" took place *before* Defendant was even charged. And at the evidentiary hearing, the only post-indictment evidence of knowledge identified by the Government consisted of a 2021 tip from the Nigerian Independent Corrupt Practices and Other Related Offences Commission ("ICPC"). This tip, which stated that Defendant was evading prosecution and refusing to return to the United States, hardly proves Defendant's knowledge of the indictment.

*Id* at 1343. Thus, *Odunna* is distinguishable and inapplicable. Here, the United States made diligent efforts to return Watson to the United States; and Watson was a fugitive who knew in January 2021 that he had been indicted but did not assert his right to a speedy trial before his return to the United States in January 2026. As discussed, the second and third *Barker* factors weigh against Watson. Indeed, *Doggett* applies and the third factor weighs heavily against Watson.

Watson cites *United States v. De La Torre*, No. 20-cr-20185-Williams, 2022 WL 20538953 (S.D. Fla. Oct. 21, 2022), wherein United States Magistrate Judge Edwin G. Torres recommended that District Judge Kathleen M. Williams dismiss a superseding indictment based on his finding that the government violated De La Torre's Sixth Amendment right to a speedy trial. (*See* Motion (DE 307) at pp. 14, 16.) In *De La Torre*, the issue was whether an information filed by the government during the Covid 19 pandemic, when grand juries were not sitting, tolled limitation periods. Judge Torres concluded the information did not toll the limitation periods; therefore, nine of the fourteen counts of the superseding indictment were untimely and should be dismissed with prejudice. *Id.* at *1-13. Judge Torres also recommended that the court dismiss the entire superseding indictment with prejudice, pursuant to the Sixth Amendment. *Id*. at *14-18.

Watson's reliance on *De La Torre* is mistaken. The United States filed objections to Judge Torres' report. (*See* United States' Objections to Report and Recommendations, DE 85 in Case No. 20-cr-20185.) Judge Williams dismissed the nine counts that Judge Torres found to be barred by the statute of limitations; however, Her Honor sustained the government's objection to Judge Torres' recommendation that the superseding indictment be dismissed for violation of the Sixth Amendment. (*See* Paperless Order, DE 103 in Case No. 20-cr-20185.) Subsequently, De La Torre pleaded guilty to Counts 1 and 14 of the superseding indictment. (*See* Plea Agreement, DE 110 in Case No. 20-cr-20185.)

WHEREFORE, the United States requests that the Court make the following findings of fact and conclusions of law, and deny the Defendant's Motion to Dismiss Indictment for Violation of the Sixth Amendment:

1. The first *Barker* factor (length of the delay) is neutral or weighs slightly against the United States;
2. The second *Barker* factor (reason for the delay) weighs against Watson because he was a fugitive from October 2017, when he first went to Nicaragua, or January 27, 2021, when he received a copy of the Indictment and did not return to the United States;
3. The third *Barker* factor (the defendant's assertion of his Sixth Amendment right to a speedy trial) weighs heavily against Watson, because he knew of the Indictment on January 27, 2021, but did not assert his right to a speedy trial until September 13, 2026; and
4. The fourth *Barker* factor (actual prejudice) precludes Watson's Sixth Amendment claim because he fails to show any actual prejudice attributable to the post-indictment delay.

Respectfully submitted,

JASON A. REDING QUIÑONES
UNITED STATES ATTORNEY

By: **Dwayne Williams**
DWAYNE EDWARD WILLIAMS
Assistant United States Attorney
Florida Bar No. 0125199
99 Northeast 4th Street
Miami, Florida 33132-2111
Tel: (305) 961-9163
Fax: (305) 530-6168
Dwayne.Williams@usdoj.gov

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on September 25, 2026, I electronically filed the foregoing United States' Response in Opposition to the Defendant's Motion to Dismiss Indictment for Violation of the Sixth Amendment, with the Clerk of the Court using CM/ECF.

**Dwayne Williams**
Dwayne E. Williams
Assistant United States Attorney